J-S02002-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
ROBERT RICHARDSON :
:
Appellant : No. 1744 EDA 2019

Appeal from the PCRA Order Entered May 23, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0905521-1995

BEFORE:  BENDER, P.J.E., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY BENDER, P.J.E.:                   **FILED:  MAY 3, 2021**

Appellant, Robert Richardson, appeals from the order dismissing his petition filed under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546.  After careful review, we vacate the order denying relief, and remand for further proceedings.

The PCRA court summarized the relevant facts underlying Appellant's conviction, and the subsequent procedural history of this case, as follows:

> The evidence adduced at trial showed that [Appellant] shot victim Vaughn Gaillard after Gaillard declined a rematch after [Appellant] and his co-defendant Clifford Brown lost a game of dice outside "J's Big Shot Bar" (aka "Ike's") on Narragansett Street and Stenton Avenue in Philadelphia.  At Brown's direction, [Appellant] shot Gaillard in the side and back as he walked away with the winnings from the dice game.  As Gaillard was lying on the ground, Brown told [Appellant] to shoot again and take his money, and [Appellant] complied.
>
> Witness Dana Lucas ("Lucas") testified at trial that she heard the men argue over Gaillard['s] not wanting to continue playing dice and that she saw [Appellant], with whom she had gone to middle

school and knew from the neighborhood, shoot Gaillard. After the shooting, she went to the hospital and slipped a note to a female police officer, identifying [Appellant] and Brown as the perpetrators. Lucas testified at trial that she feared for her life if she spoke to the police, which was why she didn't approach any officers at the scene. Later, on the same night as the shooting, Lucas gave two statements to police and identified [Appellant] in a photo array. Subsequently, Lucas was placed in protective housing prior to trial due to retaliatory threats.

Witness Henry Jones, a longtime friend of [Appellant], Gaillard, and Brown, provided a police statement and testified at the preliminary hearing that he saw [Appellant] shoot Gaillard after an argument over a game of dice. Jones later went into hiding before trial, but police located him and placed him in custody for trial. He testified at trial consistent with his prior statements[,] except at trial he claimed that he did not see the actual shots fired.

On May 14, 1997, a jury found [Appellant] guilty of first-degree murder, possessing an instrument of crime (PIC), and criminal conspiracy. On July 16, 1997, [Appellant] was sentenced to life imprisonment for [first-degree] murder, a concurrent [term of] 1 to 5 years['] … imprisonment for PIC, and a consecutive term of 3 to 10 years['] imprisonment for criminal conspiracy. The Superior Court affirmed [Appellant]'s judgment of sentence on January 27, 2000[, and the] Pennsylvania Supreme Court denied his petition for allowance of appeal on July 10, 2000. [**Commonwealth v. Richardson**, 752 A.2d 424 (Pa. Super. 2000) (unpublished memorandum), *appeal denied*, 759 A.2d 922 (Pa. 2000).]

On February 27, 2001, [Appellant] filed his first *pro se* PCRA petition. This was dismissed as meritless on September 12, 2001. The Superior Court affirmed on October 2, 2002. [**Commonwealth v. Richardson**, 815 A.2d 1130 (Pa. Super. 2002) (unpublished memorandum).] [Appellant] did not seek further review.

Subsequently, [Appellant] filed a second PCRA petition in which he claimed that trial counsel was ineffective for failing to call three alleged eyewitnesses: Jamilliah Poston; Jaime Meekins; and fellow inmate Christopher Jones, who would all testify that [Appellant] was not the shooter.[1] This was dismissed as untimely on April 20, 2007. A panel of the Superior Court reversed the PCRA court's dismissal and remanded the matter for a hearing on March 4, 2008. The Superior Court granted the Commonwealth's

application for reargument and ultimately agreed that [Appellant]'s second petition was untimely, [and t]he Pennsylvania Supreme Court denied further review on September 28, 2009. [**Commonwealth v. Richardson**, 974 A.2d 1190 (Pa. Super. 2009) (unpublished memorandum) (*en banc*), *appeal denied*, 980 A.2d 607 (Pa. 2009).]

[1] [Appellant]'s co-defendant Brown was also convicted of first[-]degree murder, PIC, and criminal conspiracy in connection with the murder of Gaillard. During Brown's direct appeal, he claimed that alleged eyewitness William Hannible, who happened to be incarcerated with Brown prior to trial, would testify that Brown did not do anything to instigate the shooting and that he did not tell [Appellant] to shoot Gaillard. Hannible testified at an evidentiary hearing on August 21, 2000. The PCRA court denied relief and the Superior Court affirmed. At no time during his testimony at the hearing did Hannible claim that "Hasan" was the true shooter. Notably, William Hannible is the same person [who] Robert Gore claims[,] in his undated, unsworn, handwritten statement[,] told him that Hasan shot Gaillard.

Brown filed several more PCRA petitions. In each, he claimed to have discovered new eyewitnesses while incarcerated, including fellow inmate Shareef Cato (who stated that he was present at the scene, that Lucas had gone inside the bar just prior to the actual shooting, and that [Appellant] shot Gaillard); fellow inmate Tyrone Williams (who claimed Lucas was inside the bar during the shooting); and fellow inmate Andrew Lewis (who claimed he spoke with Lucas at the hospital and told her to implicate Brown).

On May 8, 2008, while his appeal was still pending from his second PCRA petition, [Appellant] filed a third *pro se* petition. This petition was returned to [Appellant] as unfiled. On November 15, 2010, [Appellant] refiled this petition. It was dismissed as untimely; the Superior Court affirmed this dismissal on November 7, 2012[, and t]he Pennsylvania Supreme Court denied his petition for allowance of appeal on March 27, 2013. [**Commonwealth v. Richardson**, 63 A.3d 820 (Pa. Super. 2012), *appeal denied*, 63 A.3d 1246 (Pa. 2013).]

On March 20, 2015, [Appellant] filed a fourth *pro se* petition, the subject of the case at bar. On May 26, 2015, [Appellant] filed a

- 3 -

supplemental petition. On December 9, 2016, Benjamin Cooper[, Esq.,] was appointed as PCRA counsel. On June 16, 2017, counsel filed an amended petition. In his amended petition, [Appellant] claimed that he found three new witnesses—Gregory Young, Michael Fiddeman, and Robert Gore—who would testify that a man named "Hasan[,]" who is now deceased, was the actual shooter. He claimed that Young and Fiddeman fled from the scene immediately after the shooting and never spoke to police. On November 13, 2017, the Commonwealth filed [a] Motion to Dismiss. On July 2 and 5, 2018, Judge Geroff conducted an evidentiary hearing. At this hearing, [Appellant] produced Dana Lucas as a surprise witness during the second day of testimony.[2,1] Lucas recanted her testimony from trial and stated that she was inside a bar and did not actually see the shooting. She further testified that she struck a secret deal with a detective to have her credit card fraud charges dropped in exchange for identifying [Appellant] as the shooter. On November 8, 2018, counsel amended his petition.

> [2] The Commonwealth strenuously objected to Lucas['s] testifying at the evidentiary hearing as [Appellant] had not included her in his petition[,] nor had he submitted an affidavit from her prior to the hearing. Rather, [Appellant] and his counsel claimed that Lucas happened to reach out to their investigator a few days before the hearing and that she chose to come forward at that time.

On December 18, 2018, this matter was reassigned to this [c]ourt from Judge Geroff's judicial inventory. On April 23, 2019, this [c]ourt sent [Appellant] a Notice of Intent to Dismiss Pursuant to [Pa.R.Crim.P] 907. On April 29, 2019, [Appellant] replied [*pro se*] to the 907 notice, objecting to dismissal. On May 23, 2019, this [c]ourt dismissed [Appellant]'s petition…. On June 13, 2019, [Appellant] filed a Notice of Appeal to Superior Court.

PCRA Court Opinion ("PCO"), 12/20/19, at 1-4.

_____

[1] Additionally, Judge Geroff heard testimony from Appellant, Young, and Fiddeman. **See** N.T., 7/2/18, at 9 (Young), 81 (Fiddeman); **and see** N.T., 7/5/18, at 9 (Lucas), 106 (Appellant). Gore died before the start of the hearing. N.T., 7/5/18, at 151.

The PCRA court did not order Appellant to file a Pa.R.A.P. 1925(b) statement, and he did not file one. The court issued its Rule 1925(a) opinion on December 20, 2019.

Appellant now presents the following questions for our review:

1. Did the Commonwealth violate due process of law when it failed to disclose to trial counsel that Dana Lucas testified pursuant to an agreement for leniency and failed to correct her false testimony that she had no such deal?

2. Has Appellant met the standard for a new trial pursuant to the newly[-]discovered evidence standard?

3. Is Appellant entitled to relief because he is actually innocent of the offense?

Appellant's Brief at 2.

Initially, we note that:

We review an order dismissing a petition under the PCRA in the light most favorable to the prevailing party at the PCRA level. This review is limited to the findings of the PCRA court and the evidence of record. We will not disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error. This Court may affirm a PCRA court's decision on any grounds if the record supports it. Further, we grant great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record. However, we afford no such deference to its legal conclusions. Where the petitioner raises questions of law, our standard of review is *de novo* and our scope of review plenary.

*Commonwealth v. Ford*, 44 A.3d 1190, 1194 (Pa. Super. 2012) (internal citations omitted).

Generally, the PCRA's time limitations implicate our jurisdiction and may not be altered or disregarded in order to address the merits of a petition. *See Commonwealth v. Bennett*, 930 A.2d 1264, 1267 (Pa. 2007). Under the

PCRA, any petition for post-conviction relief, including a second or subsequent one, must be filed within one year of the date the judgment of sentence becomes final, unless one of the following exceptions set forth in 42 Pa.C.S. § 9545(b)(1)(i)-(iii) applies:

> **(b) Time for filing petition.--**
>
> > (1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:
> >
> > > (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
> > >
> > > (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or
> > >
> > > (iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

42 Pa.C.S. § 9545(b)(1)(i)-(iii). Additionally, at the time Appellant's petition was filed, section 9545(b)(2) required that any petition attempting to invoke one of these exceptions "be filed within sixty days of the date the claim could have been presented." 42 Pa.C.S. § 9545(b)(2).[2]

---

[2] An amendment to section 9545(b)(2), which became effective on December 24, 2018, changed the language to require that a petition "be filed within one year of the date the claim could have been presented." 42 Pa.C.S. §

**I**

We first address Appellant's third claim, as it presents an attempt to bypass the PCRA's time limitations.  Appellant argues that "this Court should recognize a freestanding claim of actual innocence under the Pennsylvania and federal constitutions" that is not subject to the PCRA's time bar.  Appellant's Brief at 45.  Appellant asserts that such relief is potentially available "under the Eighth and Fourteenth Amendments to the United States Constitution[,]" and/or pursuant to the analogous and/or greater rights articulated under "Article 1, Section 13 and Article 1, Section 9" of the Pennsylvania Constitution.  Appellant's Brief at 42.  Appellant cites for persuasive value several cases from sister jurisdictions in which a freestanding claim of innocence has been recognized, bypassing the typical timeliness restrictions for collateral review of criminal convictions.  *See id.* at 44-45.

The Commonwealth contends this claim was waived due to Appellant's failure to raise it in the PCRA court, and we are compelled to agree.  Appellant did not raise such a claim in his *pro se* petition, in an amendment thereto, or in his response to the PCRA court's Rule 907 notice, nor has Appellant directed this Court's attention to where in the record such a claim was preserved below.  Accordingly, this claim was waived for purposes of this appeal.  *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised

_____

9545(b)(2). That amendment applies to any claims arising on or after December 24, 2017, and, thus, does not apply to Appellant's petition.

- 7 -

for the first time on appeal."); *see also* Pa.R.A.P. 2117(c), 2119(e) (requiring an appellant's brief to identify the place of raising or preserving of issues).

## II

As to Appellant's remaining claims, he first asserts that Lucas's recantation (and the related, subsidiary revelation that she had a deal with police to have her charges 'go away' if she acquiesced to identifying Appellant as the shooter), constitutes newly-discovered fact of a ***Brady***[3] violation that satisfies the timeliness exception set forth in Section 9545(b)(1)(ii). Appellant accurately recounted Lucas's testimony at the PCRA hearing as follows:

> ***Dana Lucas*** testified that she was twenty-two years old at the time of the shooting about which she testified. She confirmed that she was at the location of the Ga[i]ll[]ard shooting. N[.]T[.,] 7/5/2018, [at] 9-10. She "had quite a bit" of alcohol to drink on that night and she was intoxicated at the time of the shooting and

---

[3] ***Brady v. Maryland***, 373 U.S. 83 (1963).

> In ***Brady***, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." ***Brady***, 373 U.S. at 87…. The Supreme Court subsequently held that the duty to disclose such evidence is applicable even if there has been no request by the accused, ***United States v. Agurs***, 427 U.S. 97, 107 … (1976), and that the duty may encompass impeachment evidence as well as directly exculpatory evidence, ***United States v. Bagley***, 473 U.S. 667, 676–77… (1985). Furthermore, the prosecution's ***Brady*** obligation extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution. ***Kyles v. Whitley***, 514 U.S. 419, 438… [(1995)]; ***Commonwealth v. Burke***, … 781 A.2d 1136, 1142 ([Pa.] 2001).

***Commonwealth v. Lambert***, 884 A.2d 848, 853–54 (Pa. 2005).

police interview. The shooting took place just outside of a bar, and she was in the bar drinking when there was a commotion outside the bar. *Id.* [at] 11. She swiveled in her chair to see what it was, but she could not. She saw people running in and out of the bar and she heard from her friend, Hank, that "Vaughn got shot." She related that Vaughn was her "best friend's boyfriend." *Id.*[ at] 13-14. Hank said that "Quick" shot Vaughn. *Id.*[ at] 15. She identified Quick as Appellant in court. *Id.*[ at] 16. She went outside minutes later and saw police on scene. *Id.*[]

She spoke to a detective on scene who ask[ed] her if she "knew what happened" and she responded that she did -- she said that Quick shot Vaughn. She gave her name to the detective and told him that she was on her way to the hospital. She said this because it was what Hank told her. *Id.*[ at] 18. She admitted that she did not see what happened. She was questioned in greater detail at the hospital. *Id.*[ at] 21. She told the detective that she saw the shooting, which was not true. She agreed to testify if asked. *Id.* [at] 24.

Her post-conviction affidavit was marked at the hearing at D-5. *Id.*[ at] 25-26.

About a week after the shooting she was contacted on the phone by the detective who asked to meet with her. The detective showed her a mug shot of *her*. The detective then told her that "we'll help you if you help us." She agreed and the detective told her that he could make the charges "go away." *Id.*[ at] 26-27. She apologized for doing this:

> I pretty much agreed to say what it was that I needed to say to get my record clear and to go along with what they wanted me to say. And I *apologize* for that. I had three small children, and I'm frustrated. I'm hurt. I didn't have anybody in my corner. So I felt as though I had to look out for myself at that time.[12]

*Id.*[ at] 27. She further explained that she lied to the police when she said that she saw Quick shoot, and she reiterated that she said that only because her friend Hank told her that was the case and she believed it to be true. *Id.*[ at] 32. Thus, she admitted to having two motives to lie: "I wanted somebody to be held responsible for killing my friend. And at the same time, I wanted a chance to get the type of job and live the type of life that my kids and I needed to have." *Id.*[ at] 32-33.

<sup>12</sup> As noted above, no record of any conviction for Dana Lucas currently exists on the Judicial Website, even though she had been arrested on at least two prior occasions. It thus appears that the charges "went away." She explained that she never had a trial, and when asked what happened to the cases, she responded "they went away." ***Id.***[ at] 29. In fact, she related that she subsequently obtained employment at 601 Market Street, "the federal building" and "nothing has come up."

Lucas said that subsequent to Appellant's trial she was not spoken to by anybody on behalf of Appellant. Immediately before her PCRA testimony, she learned from a friend that an investigator was looking for her, and the friend provided her with the investigator's number. She was then subpoenaed to the hearing. ***Id.***[ at] 37-38. She reiterated that she signed the affidavit two days before her hearing testimony. ***Id.***[ at] 39.

Appellant's Brief at 18-20 (emphasis in original).

The PCRA court's opinion only fleetingly addressed Appellant's Lucas-related ***Brady*** claim with respect to the newly-discovered fact exception. ***See*** PCO at 5-6. In fact, it is not clear if the court analyzed the underlying merits of the claim under the 'after-discovered' evidence standard, or if it addressed the standard for 'newly-discovered' evidence as an exception to the PCRA's time bar. Thus, it is appropriate to distinguish these standards. Our Supreme Court has stated that:

[G]enerally, the exception to the PCRA's time requirements set forth in subsection 9545(b)(1)(ii) is now referred to as the "newly-discovered fact" exception. While, on occasion, some courts have used a variation of this phrase, … the phrase "newly-discovered fact" timeliness exception, in our view, most accurately reflects the requirements of subsection 9545(b)(1)(ii), and is the least likely to be confused with the after-discovered evidence eligibility-

- 10 -

for-relief provision set forth in subsection 9543(a)(2).[4]  Thus, for purposes of clarity and consistency, we encourage courts to utilize the phrase "newly-discovered fact(s)" when referring to the timeliness exception provided under subsection 9545(b)(1)(ii).

\*\*\*

To reiterate, the newly-discovered facts exception to the time limitations of the PCRA, as set forth in subsection 9545(b)(1)(ii), is distinct from the after-discovered evidence basis for relief delineated in 42 Pa.C.S. § 9543(a)(2).  To qualify for an exception to the PCRA's time limitations under subsection 9545(b)(1)(ii), a petitioner need only establish that the facts upon which the claim is based were unknown to him and could not have been ascertained by the exercise of due diligence.  However, where a petition is otherwise timely, to prevail on an after-discovered evidence claim for relief under subsection 9543(a)(2)(vi), a petitioner must prove that (1) the exculpatory evidence has been discovered after trial and could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict.

*Commonwealth v. Burton*, 158 A.3d 618, 628–29 (Pa. 2017) (citations omitted).  Importantly, the "newly[-]discovered [fact] exception, set forth in Section 9545(b)(1)(ii), … does not require a merits analysis of the claim in order for it to qualify as timely and warranting merits review.  The exception merely requires that the 'facts' upon which such a claim is predicated must not have been known to [the] appellant, nor could they have been ascertained by due diligence."  *Commonwealth v. Lambert*, 884 A.2d 848, 852 (Pa. 2005).

---

[4] Section 9543(a)(2)(iv) permits relief under the PCRA when "exculpatory evidence" unavailable at trial, "has subsequently become available and would have changed the outcome of the trial if it had been introduced."  42 Pa.C.S. § 9543(a)(2)(iv).

- 11 -

We must initially address the Commonwealth's assertion that "[Appellant] failed to raise this post-hearing claim as a basis for any statutory exception to the PCRA statute's timeliness requirement, a fatal omission he makes no attempt to rectify on appeal." Commonwealth's Brief at 17. We disagree. In the circumstances of this case, it was alleged by Appellant at the first PCRA hearing, and acknowledged by the PCRA court in its opinion, that Lucas was a surprise witness who only came forward days before the hearing, long after Appellant's *pro se* and first-amended PCRA petitions were filed. Her testimony, at least facially, established a potential **Brady** violation, as she stated that her in-court identification of Appellant as the shooter was prompted by a deal to make her charges 'go away,' which contradicted her trial testimony that no deal had been offered, despite acknowledging that she had pending charges at that time. Prior PCRA counsel, Attorney Cooper, attempted to raise this matter in a second Amended petition that followed the hearing.[5] In any event, in his *pro se* response to the court's Rule 907 notice, Appellant clearly attempted to raise a **Brady** claim in relation to Lucas' testimony in response to the court's assertion that the petition was to be denied on the merits. The PCRA court then summarily dismissed the petition

_____

[5] As acknowledged by Appellant through his current counsel, prior counsel's filing of the second amended petition was deficient in several ways. Attorney Cooper filed that amendment without first seeking leave to do so. Problematically, nothing in the record suggests that the PCRA court rejected the filing, and the PCRA court does not clarify the matter in its Rule 1925(a) opinion. The second amended petition reads as a summary of the testimony provided at the hearings, and includes a summary of Lucas' testimony, but it does not specifically cite **Brady** or provide legal analysis as to that claim.

without having addressed Appellant's response to the Rule 907 notice in any way. In its Rule 1925(a) opinion, the court never asserts that Appellant waived this claim, instead providing an analysis rejecting the claim on the merits, or for having been previously litigated. This suggests that the court implicitly acknowledged that the claim had been sufficiently raised to permit the court to address it. Given this record, and the apparent abandonment of Appellant by Attorney Cooper at a critical time in the proceedings below, **see** n.7 **infra**, we decline to find waiver in the specific circumstances of this case, in the interests of both justice and judicial economy. Thus, we now turn to address whether the new fact(s) established through Lucas's testimony meets an exception to the PCRA's timeliness requirements.

The PCRA court states that Appellant "is unable to invoke the **after-discovered** evidence exception to the time bar as he has failed to meet his burden in his filings." PCO at 7 (emphasis added). We can only assume the court meant to assert that Appellant failed to invoke the newly-discovered fact exception. As noted above, however, in the PCRA court's Rule 907 notice of its intent to dismiss Appellant's petition, it made no mention of Appellant's failure to meet the timeliness requirement with respect to Lucas's new testimony, or with regard to any other claim. Instead, in a boilerplate form, the PCRA court checked a box stating: "The issues raised in the [PCRA] petition filed by your attorney are without merit." Rule 907 Notice, 4/23/19, at 1 (single page). The court did not check the box that stated: "Your petition is untimely filed pursuant to 42 Pa.C.S.[] § 9545(b)." Subsequently, in the

order denying the petition, the PCRA court wrote, *verbatim*: "AND NOW, this 23rd day of May, 2019, after consideration of the motion to dismiss PCRA petition based on Lack of Merit by the Commonwealth it is ORDERED that the motion to dismiss based on Lack of Merit is Granted[.]" Order, 5/23/19, at 1.

Nevertheless, in its opinion, the PCRA court addressed the new facts raised by Lucas's testimony as follows:

> Dana Lucas testified next as a surprise witness[,] as the Commonwealth had no notice that the defense planned to call her to testify. She significantly changed her account of the shooting. At trial, she had testified that she heard the argument over dice and that she saw [Appellant] shoot Gaillard. At the evidentiary hearing, however, she stated that she overheard an argument between the men playing dice as she was entering the bar, that she spent the next 3 hours drinking herself into intoxication, and that after she heard gunshots, a friend named "Hank" (aka Henry Jones) ran into the bar and said "[Appellant] shot Vaughn." She testified that Hank told her that if anyone asked, she should say that Quick was the shooter. Lucas testified that she spoke to a male police officer at the scene and then spoke to the same man again at the hospital. The Commonwealth produced documents showing that she gave two statements to police that night, in which she provided a detailed account of the argument, shooting, and aftermath. In these statements, she identified [Appellant] as the shooter. The police also showed her a photo array and she identified [Appellant] once more. However, at the evidentiary hearing, Lucas claimed that the detectives helped her write those statements and stated that a week after the shooting, she met with a detective who told her he would make her credit card fraud charges disappear if she cooperated with the police. Lucas testified that she never told anyone about being inside the bar during the shooting and the deal with the detective until she contacted an investigator in July 2018[,] just days before the evidentiary hearing and he asked her to write down what happened. []N.T.[,] 7/5/18, [at 15-103].

***

- 14 -

With respect to Lucas, [Appellant] admits that he learned of her credit card fraud charges years before. In fact, he raised this issue in his third PCRA petition, claiming that Lucas was relocated by the Commonwealth and her open charges were dismissed in exchange for her testimony against him. He alleged that he received a copy of Lucas'[s] criminal record from a reporter at The Legal Researcher Exhibit News on March 22, 2009, and that this showed the charges were *nolle prossed*. The PCRA court dismissed [Appellant]'s third petition as untimely and without merit. The court held that [Appellant] failed to show due diligence since Lucas'[s] criminal records could have been obtained sooner from The Office of Judicial Records. Moreover, the court held that this alleged after-discovered evidence would not compel a different verdict since the Commonwealth "presented adequate evidence of Petitioner's guilt beyond a reasonable doubt notwithstanding Ms. Lucas'[s] alleged outstanding criminal case," which the jury was aware of as "Ms. Lucas testified that she had open criminal charges regarding credit cards." []PCRA [Court] Opinion, 3/5/12, [at] 5 [n.]5[].

Additionally, [Appellant] fails to satisfy the prejudice prong as he did not successfully plead and prove that the outcome of the trial would have been different with this "new" evidence. Both Young and Fiddeman's accounts from the night of the shooting are highly suspect, particularly since Fiddeman is a fellow inmate at SCI - Huntingdon. As for Lucas, [Appellant] claims that Lucas was the "only eyewitness" to testify at trial; therefore, her recantation is significant. This is false. The record shows Henry Jones also testified at trial and identified [Appellant] as the shooter.[6] According to police testimony at trial, no one spoke with Lucas at the crime scene; rather, she approached a female officer, Lillian Rosario, at the hospital and slipped her a note with [Appellant] and Brown's information on it. Lucas later gave two separate detailed interviews to homicide detectives that night and identified [Appellant], whom she had known since middle school, in a photo array. Lucas told police she feared for her life and was receiving threats of retaliation for cooperating with police[,] so she was placed in protective housing prior to testifying. None of this comports with her incredible new testimony that she was somehow unwilling to cooperate and only did so a week after the shooting when a detective made a secret deal with her regarding her credit card fraud. Nor is it credible that she was extremely drunk on the night of the shooting yet remembers all the details. Likewise, her testimony that the argument over game winnings

- 15 -

that led to the shooting happened three hours before the actual shooting is incredible. As stated above, recantation testimony, particularly where a witness claims he or she committed perjury, is considered extremely unreliable. Lucas'[s] testimony at the evidentiary hearing was not credible and would not likely result in a different verdict if a new trial were granted. Therefore, no relief is due.

> [6] Jones gave police statements and testified at the preliminary hearing that he saw [Appellant] shoot Gaillard. Jones became afraid after receiving threats for testifying; he was taken into custody and forced to appear at trial to testify. At trial, he testified consistently with prior statements except that he refused to say he actually witnessed the shooting. The jury was aware of all of Jones' testimony and prior statements and ultimately found [Appellant] guilty of Gaillard's murder.

PCO at 11-12, 14-15.

Notably, nothing in the PCRA court's analysis dealt explicitly with the newly-discovered fact exception with respect to Lucas's new testimony, despite the fact that satisfaction of a timeliness issue is a threshold inquiry implicating the court's jurisdiction. Instead, the court ascertained that Appellant's claim was barred as having been previously litigated under Section 9543(a)(3),[6] reasoning that Appellant knew about Lucas's criminal records previously and had raised the same **Brady** claim in his third PCRA petition. Arguably, this might suggest that the PCRA court had determined that Lucas's testimony was effectively the same evidence, and therefore, not newly-

---

[6] That provision dictates that, to "be eligible for relief under this subchapter, the petitioner must plead and prove by a preponderance of the evidence all of the following: … (3) That the allegation of error has not been previously litigated or waived." 42 Pa.C.S. § 9543(a)(3). Section 9544(a) defines when an issue has been previously litigated for purposes of the PCRA.

discovered for purposes of Section 9545(b)(1)(ii), but the PCRA court never stated that explicitly in its opinion.

This is troubling because,

> [t]he purpose behind a Rule 907 pre-dismissal notice is to allow a petitioner an opportunity to seek leave to amend his petition and correct any material defects, **see Commonwealth v. Williams**, … 782 A.2d 517, 526 ([Pa.] 2001), the ultimate goal being to permit merits review by the PCRA court of potentially arguable claims. The response is an opportunity for a petitioner and/or his counsel to object to the dismissal and alert the PCRA court of a perceived error, permitting the court to "discern the potential for amendment." **Id.** at 527.

**Commonwealth v. Rykard**, 55 A.3d 1177, 1189 (Pa. Super. 2012).

Here, Appellant responded to the Rule 907 notice *pro se*,[7] and specifically requested the court consider his **Brady** claim based on Lucas's testimony at the PCRA hearing. **See** Appellant's *Pro Se* Response to the PCRA Court's Rule 907 Notice, 4/29/19, at ¶¶ 1 *et seq*. (unnumbered pages). Appellant was never notified that the PCRA court intended to deny any claim on timeliness grounds or as having been previously litigated. Thus, he was effectively denied the opportunity to seek leave to amend his petition to correct those defects.

---

[7] It appears that prior PCRA counsel, Attorney Cooper, effectively abandoned Appellant by this point in the procedural history of this case. We find no evidence in the record of Attorney Cooper filing anything with the lower court after he submitted the second amended petition, which, as discussed above, was defective in several respects. Appellant filed a *pro se* response to the Rule 907 notice, and a *pro se* notice of appeal, and was effectively deprived of the assistance of counsel until current counsel entered his appearance with this Court in November of 2019.

In any event, the specific **Brady** issue presented by Lucas's new testimony was not previously litigated. The interplay between Section 9543(a)(3)'s bar on previously-litigated claims and the newly-discovered fact exception was explained by our Supreme Court as follows:

> In this context, "issue" is "the discrete legal ground" that was forwarded to the highest appellate court and which would have entitled the defendant to relief. **Commonwealth v. Collins**, 888 A.2d 564, 570 (Pa. 2005). Although there can be many theories and allegations in support of a single issue, Section 9544 refers to the discrete legal ground already raised and decided. **Id. An issue is not previously litigated when it does not rely solely upon previously litigated evidence. Commonwealth v. Miller**, 746 A.2d 592, 602 n.9 & 10 (Pa. 2000).

**Commonwealth v. Chmiel**, 173 A.3d 617, 627 (Pa. 2017) (citations reformatted, emphasis added).

Here, during the litigation of Appellant's third PCRA petition, we explained his prior **Brady** claim as follows:

> Appellant's alleged newly-discovered evidence consists of public criminal records, which date back to 1990 and predate Appellant's trial. Appellant alleges that these criminal records show that Commonwealth witness, Dana Lucas, had outstanding criminal charges at the time she testified against Appellant. Appellant asserts Lucas "received sweetheart leniency" in exchange for her testimony against him and claims he was never made aware of the charges or the alleged leniency agreement during trial. As such, Appellant asserts the Commonwealth violated its duty to turn over exculpatory evidence pursuant to **Brady** and its progeny.

**Commonwealth v. Richardson**, No. 3329 EDA 2011, unpublished memorandum at 6 (Pa. Super. filed November 7, 2012) (citations and footnote omitted).

- 18 -

Appellant's current **Brady** claim is premised upon Lucas's PCRA hearing testimony, and not solely upon his prior discovery of Lucas's public criminal records, the at-issue evidence during Appellant's litigation of his third PCRA petition. Indeed, the mere inference from the records alone of an undisclosed deal is a far cry from testimony to the same effect by a party to the arrangement, assuming that testimony is credible. Accordingly, as the current claim is not premised solely upon previously-litigated evidence or substantially similar evidence, we conclude that the PCRA court erred when it determined that Appellant's claim was previously litigated.

Similarly, the record clearly establishes that Lucas's testimony regarding the promise of leniency is a newly-discovered fact for purposes of Section 9545(b)(1)(ii). Nothing in the record suggests that her admission of a deal for leniency, or her general recantation of her trial testimony, were facts previously known to Appellant before Lucas agreed to testify just days before the PCRA hearing. Indeed, Lucas testified that she never told anyone about the deal until that time. N.T., 7/5/18, at 33. Thus, the first prong of the newly-discovered fact test was satisfied.

As to the due-diligence prong, we note that:

> Due diligence demands the petitioner to take reasonable steps to protect her own interests. **Commonwealth v. Carr**, 768 A.2d 1164 (Pa. Super. 2001). This standard, however, entails "neither perfect vigilance nor punctilious care, but rather it requires reasonable efforts by a petitioner, based on the particular circumstances, to uncover facts that may support a claim for collateral relief." **Commonwealth v. Burton**, 121 A.3d 1063, 1071 (Pa. Super. 2015) (*en banc*)…. Thus, "the due diligence

inquiry is fact-sensitive and dependent upon the circumstances presented." *Id.* at 1070.

*Commonwealth v. Shiloh*, 170 A.3d 553, 558 (Pa. Super. 2017).

As noted above, Lucas testified that, until just days before the PCRA hearing, she had never told anyone that her trial testimony was false with respect to either her identification of Appellant or the presence of a deal for her testimony. N.T., 7/5/18, at 33. She also indicated that, years after the trial, she was still fearful of retaliation for her testimony. *Id.* at 35. Only a year before her PCRA court testimony, she indicated that someone had messaged her on Facebook, asking her to "tell the truth." *Id.* at 36. She did not respond and, instead, she changed her Facebook account. *Id.* Ultimately, upon overhearing a conversation about Appellant's case a few days before the hearing, she contacted the investigator working for Attorney Cooper. *Id.* at 38. Appellant testified that he never stopped searching for people who could exonerate him since he was convicted. *Id.* at 148-49. However, he indicated that he did not have an investigator to assist him for most of that time. *Id.* at 148.

We conclude that there was adequate evidence presented through the testimonies of Appellant and Lucas to establish that Appellant acted with due diligence. Appellant indicated that he never stopped searching for witnesses to exonerate him, and the procedural history of this case demonstrates that Appellant has continually maintained his innocence and repeatedly filed PCRA petitions seeking relief as new information became known to him. We note that Appellant, incarcerated and indigent, did not have the wherewithal to

mount an extensive investigation over decades, and there is nothing in Lucas's testimony indicating that she would have come forward at an earlier time even had Appellant contacted her. To the contrary, her testimony suggests that she was fearful of retaliation for decades after she testified at Appellant's trial, and that she made no efforts to recant until, just days before the PCRA hearing, she learned that an investigator was looking for her, and she then contacted that investigator.

In any event, we would find it untenable and unreasonable to impose a standard on PCRA petitioners that would require them to continually harass a Commonwealth's witness for decades after conviction in order satisfy the due diligence requirement in the event that said witness eventually comes forward to recant or provide new evidence, especially where, in the circumstances of this case, Lucas had been placed in protective custody at the time of Appellant's trial, and was fearful of reprisal for her testimony. Accordingly, we conclude that Lucas's new admissions and recantation of her trial testimony, at least facially (independent of credibility), would constitute newly-discovered facts under Section 9545(b)(1)(ii).

The PCRA court also determined that the Lucas-related after-discovered evidence/***Brady*** claim lacks merit, based on its determination that Lucas's new testimony would be unlikely to compel a new verdict, as the court found her testimony incredible. However, because the judge making the relevant credibility determination was not present during the hearing where Lucas's new testimony was heard, we cannot affirm the PCRA court's denial of

Appellant's PCRA petition on that basis and, instead, we find the most appropriate course of action is to remand for further proceedings.

Our Supreme Court "has often acknowledged the limitations inherent in recantation testimony," *see*, *e.g.*, *Commonwealth v. Floyd*, 484 A.2d 365, 369 (Pa. 1984) (characterizing recantation testimony as "extremely unreliable")," however, the Court never "foreclosed the possibility that, in some instances, such testimony may be believed by the factfinder and[,] thus[,] form a basis for relief." *Commonwealth v. Williams*, 732 A.2d 1167, 1180 (Pa. 1999) (citation reformatted). Thus, the mere fact that Lucas recanted her prior testimony does not, as a matter of law, render her new testimony incredible. At the same time, a

> PCRA court passes on witness credibility at PCRA hearings, and its credibility determinations should be provided great deference by reviewing courts. Indeed, one of the primary reasons PCRA hearings are held in the first place is so that credibility determinations can be made; otherwise, issues of material fact could be decided on pleadings and affidavits alone.

*Commonwealth v. Johnson*, 966 A.2d 523, 539 (Pa. 2009) (citations omitted).

Consequently, our Supreme Court has also noted that,

> [w]here appropriate, we have remanded matters involving after-discovered evidence claims and specifically directed the trial or PCRA court to make credibility determinations on recantation testimony. For example, in *Williams*, the PCRA court failed to make an independent determination as to the credibility of the recanting witness. This Court noted the PCRA court, as fact-finder, "is in a superior position to make the initial assessment of the importance of [the recantation] testimony to the outcome of the case," and remanded with a direction for the PCRA court to

"render its own, independent findings of fact and conclusions of law concerning [the recanting person's] credibility and the impact, if any, upon the truth-determining process which can be discerned from such testimony." [**Williams**,] 732 A.2d at 1181. Similarly, in [**Commonwealth v.**] **D'Amato**, [856 A.2d 806 (Pa. 2004),] the PCRA court failed to mention, let alone pass upon, the credibility of the recantation testimony in its opinion. After holding the PCRA court had defaulted on its duty to assess the credibility of the recantation and its significance in light of the trial record, this Court remanded the matter for the limited purpose of allowing the PCRA court to make that determination. [**D'Amato**,] 856 A.2d at 825-26.

**Commonwealth v. Small**, 189 A.3d 961, 978 (Pa. 2018).

Here, a different problem arises, as Judge Brinkley, currently sitting as the PCRA court, made the relevant credibility assessment of Lucas's testimony as to the after-discovered evidence claim, but it was now-retired Judge Geroff who heard that testimony at the PCRA hearing at which Lucas testified. In **Commonwealth ex rel. Davis v. Davis**, 408 A.2d 849 (Pa. Super. 1979), a custody matter, a similar problem arose, where the custody hearing judge "did not file an opinion in support of the custody orders. Rather a common pleas judge, not the hearing judge, wrote the lower court's opinion upholding the hearing judge's decision." **Davis**, 408 A.2d at 850. The **Davis** Court determined that this was improper, reasoning:

While we acknowledge the opinion was ably done, it should not have been undertaken at all. The record discloses that there were serious conflicts in the testimony of the appellant and the appellee. The opinion[-]writing judge inadvertently misstated the testimony of a principal witness called on behalf of the appellant. Not uniquely peculiar to this case, the accepted facts and the inferences that can be drawn from them depend on the credibility of the testifying witnesses. **This vital function can only be determined by the judge before whom these witnesses appear.**

- 23 -

*Id.* (emphasis added). Additionally,

> [t]he Pennsylvania Superior Court considered a similar situation in the case of *Hyman v. Borock*, 235 A.2d 621 (Pa. Super. 1967), and determined that in the absence of the parties' consent, a court may not substitute another judge for the trial judge where the testimony has been heard without a jury and the trial judge has not rendered a decision on the factual issues. *Hyman* was followed in *Ciaffoni v. Ford*, 237 A.2d 250 (Pa. Super. 1968), where the Superior Court considered a situation where the trial judge had rendered a verdict, but subsequently recused himself. The Superior Court determined that the substituted judge was not entitled to rely upon the record made before the first judge in the absence of evidence of consent from both parties.

*Wasiolek v. City of Philadelphia*, 606 A.2d 642, 644 (Pa. Cmwlth. 1992) (citations reformatted).

This matter is most similar to *Hyman*, as Judge Geroff heard Lucas's testimony, but he did not rule on Lucas's credibility, nor did he issue an order granting or denying Appellant's petition. Judge Brinkley made the relevant credibility determination based on a cold reading of the record, and denied Appellant's petition on that basis, without having obtained consent from either party. Accordingly, we conclude that the appropriate course of action is to vacate the order denying relief, and remand for further proceedings. Appellant may seek leave to amend his petition to perfect his claim, and Lucas should be heard by the same judge who will ultimately assess her credibility.[8]

---

[8] Appellant may seek leave for recusal as well, as Judge Brinkley has already rendered an opinion based on the cold record of the prior PCRA hearings. However, we take no position on whether recusal should be granted at this time, as it "is the individual judge who must in the first instance determine whether in good conscience and judgment he or she can hear a dispute

- 24 -

## III

Next, Appellant claims that the PCRA court erred when it determined that neither Young's nor Fiddeman's testimony satisfied the newly-discovered fact exception to the PCRA's timeliness requirement. The PCRA court determined that Appellant never pled in his petitions when he first learned of these witnesses, and that he failed to act diligently in obtaining their testimony. *See* PCO at 7-8.

Contrarily, Appellant argues that he

has exercise[d] extraordinary diligence throughout his post-conviction litigation. He found Young and Fiddeman by happenstance and acted swiftly once he became aware of their existence. Because of his PCRA testimony that he was not aware that these two men were present at the scene, he could not have known to reach out to them before they contacted him. In other words, no degree of diligence could have led to their discovery any sooner than they were discovered.

Appellant's Brief at 40.

We note, again, that the PCRA court's Rule 907 notice never mentioned Appellant's failure to meet a timeliness exception but, instead, indicated that his claims related to Young and Fiddeman were denied on the merits. However, as due diligence is a common element to both the newly-discovered facts and after-discovered evidence standards, we will consider that aspect of the PCRA court's analysis.

With respect to Fiddeman, the PCRA court determined:

---

objectively and impartially, or whether there should be a recusal." *Lomas v. Kravitz*, 130 A.3d 107, 124 (Pa. Super. 2015).

First, during his own testimony, [Appellant] admitted that he did not file his petition within 60 days of learning about Fiddeman's account of the shooting. He testified that he met Fiddeman in prison sometime in 2014[,] shortly after Fiddeman arrived there. Fiddeman did not write his affidavit until February 2015; [Appellant] did not file [the PCRA petition under review] until March [of] 2015. The relevant date is when [Appellant] first learned of the new facts, not when the witness signed an affidavit/statement. Since Fiddeman arrived at SCI-Huntingdon in January 2014 and testified that he met [Appellant] within weeks thereafter, [Appellant] clearly did not present his claim within 60 days of learning Fiddeman's alleged new information. Moreover, Fiddeman testified that he and [Appellant] saw each other on the night of the shooting during the dice game. [Appellant] does not explain why he did not reach out to Fiddeman sooner if he knew Fiddeman was present that night. In addition, Fiddeman testified that he was the neighborhood drug dealer who always worked that corner by Ike's bar. Even if [Appellant] had not noticed Fiddeman that night, [Appellant] provides no explanation as to why he did not have an investigator seek out the regular corner drug dealers in the area. Thus, [Appellant] has failed to show he exercised due diligence with respect to Fiddeman.

PCO at 13.

We initially question the PCRA court's assertion that due diligence required Appellant to hire an investigator to "seek out the regular corner drug dealers" for information about the shooting. The court provides no case law in support of this view of due diligence, and we reject the notion that fishing expeditions of that nature are reasonable in the context of a due diligence analysis. Again, due diligence requires "neither perfect vigilance nor punctilious care, but rather it requires reasonable efforts by a petitioner, based on the particular circumstances, to uncover facts that may support a claim for collateral relief." *Burton*, 121 A.3d at 1071. Seeking out every drug dealer in the area who, by chance, may have witnessed the shooting, would demand

a tremendous amount of time and resources beyond what is typically available to a defendant in a criminal case, whether indigent or not. The PCRA court's analysis would require 'perfect vigilance,' not reasonable efforts.

Nevertheless, the court also asserts that Appellant knew Fiddeman was present at the scene of the shooting. If true, it would be reasonable to require of Appellant some efforts to investigate Fiddeman. However, the court infers this fact not from Appellant's testimony, but from Fiddeman's. Fiddeman testified that he vaguely knew of Appellant at the time of the shooting, as they both lived in the same neighborhood. *See* N.T., 7/2/18, at 107-08, 119. Basically, he testified that he knew Appellant enough to say hello, but that they were not close. During cross-examination, Fiddeman was questioned about whether he interacted with Appellant just prior to the shooting:

> Q[.] So prior to the shooting you had seen [Appellant] playing dice?
>
> A[.] Yes.
>
> Q[.] And he had seen you as you walked over, as far as you could tell?
>
> MR. COOPER: Objection to that.
>
> THE COURT: As far as you can tell. …
>
> Q[.] As far as you could tell?
>
> A[.] Yes.

*Id.* at 125.

This appears to be the only testimony by Fiddeman that could be the basis of the PCRA court's conclusion that Appellant saw Fiddeman at the scene, as Fiddeman indicated that ***he believed*** that Appellant had seen him that day, ***as far as he could tell***. Although the district attorney attempted to elicit from Fiddeman that there was an interaction between the two, Fiddeman essentially testified that he may have said hello to some people playing dice, but he did not recount any specific interaction with Appellant. Appellant testified that he knew Fiddeman from the neighborhood, but that he did not see him on the night of the shooting. N.T., 7/5/18, at 107.

It is not immediately apparent that this testimony is truly incompatible. It is possible that Appellant did not notice Fiddeman, despite Fiddeman's believing that he had. In any event, the PCRA court's basis for denying relief again turns on questions of credibility. For the same reasons set forth above with respect to Appellant's Lucas-related claim, we cannot affirm the denial of the petition based on a credibility determination made by a judge who did not hear the testimony of the two witnesses in question.

The PCRA court's conclusion that Appellant failed to satisfy Section 9545(b)(2)'s 60-day rule suffers from the same malady, as that issue also turns on a credibility analysis of the testimony of Appellant and Fiddeman. Fiddeman did not immediately speak to Appellant upon his arrival at SCI-Huntington. He came into contact with Appellant through a third party, Reik.

> Q[.] How long had you been up at Huntingdon before you talked to this fellow that you described as Reik? How long had you been up there approximately?

> A[.] Probably say about like a couple weeks when I ran into him and I'd seen him and would talk in the yard and things of that nature.

N.T., 7/2/18, at 100. There is no indication in the record when Reik and Fiddeman began speaking about Appellant's case. Reik ultimately facilitated a meeting between Fiddeman and Appellant, but it is also not clear whether Fiddeman immediately told Appellant what he knew, or whether he revealed his knowledge after a period of time.

Fiddeman dated the affidavit February 19, 2015, and gave it to Appellant. *Id.* at 95. Appellant filed the instant petition on March 20, 2015, citing Fiddeman as a witness. If Appellant did not learn of the new facts until he received the affidavit, he clearly satisfied the 60-day rule. However, the PCRA court found that Appellant must have known about the new facts before February 19, 2015, because Appellant and Fiddeman both testified that they spoke about the matter before Fiddeman wrote the affidavit. However, the record does not demonstrate when the fact was made known to Appellant. The testimony provided suggests that date could have fallen inside or outside the 60-day rule's limits. Fiddeman could not recall the date on which he first discussed Appellant's case with him. *Id.* at 121. He did say that several months had passed from when he first learned from Reik that Appellant was at SCI-Huntington, and when he ultimately wrote the affidavit. *Id.* at 123. When questioned on cross-examination, Appellant denied that he had learned

the new facts from Fiddeman as early as mid-2014.  N.T., 7/5/18, at 144.[9]

When asked if he filed his petition within 60 days of learning the new facts

from Fiddeman, he indicated that he had.   *Id.* at 154.

The record simply does not establish a precise date of when Fiddeman

first told Appellant that he had witnessed Hasan's shooting the victim.

Appellant indicated that he filed his petition within 60 days of learning of that

fact.  Fiddeman's testimony could be read to support or conflict with that

testimony, depending on what part, if any, the court deemed credible.  Thus,

credibility, again, was a crucial factor in determining whether Fiddeman's new

facts satisfied Section 9545(b)(2) and, as stated above, the judge assessing

credibility in this instance was not the judge who heard the witnesses.

Moreover, Appellant was never afforded any opportunity to perfect his petition

in this regard, as the court's Rule 907 notice indicated only that the petition

was being denied on the merits, not that it failed to satisfy a timeliness

exception, or the dictates of Section 9545(b)(2), with respect to the new facts

presented by Fiddeman.  Accordingly, we conclude that a remand is also

appropriate with respect to the new facts presented by Fiddeman's affidavit.

Young also testified at the PCRA hearing to the new fact that he saw

Hasan, not Appellant, shoot the victim.  PCO at 10.  Young wrote a letter

---

[9] During this line of questioning, the Commonwealth suggested that Fiddeman arrived at the facility on or about June 24, 2014, but there is no evidence of record establishing that date to be correct.  *Id.* at 142.  Appellant did not dispute that timeline, and he stated that he first met with Fiddeman sometime in 2014.  *Id.*

indicating this new fact to Appellant on February 27, 2015, eight days after Appellant received Fiddeman's affidavit, prompting a meeting. N.T., 7/2/18, at 26-27. Assuming the letter conveyed to Appellant this new fact for the first time, Young's new fact satisfies the 60-day rule, as he filed his petition in the following month.

Nevertheless, the PCRA court determined that Appellant did not act diligently with respect to this new fact, providing the following cursory analysis:

> [Appellant] has also failed to demonstrate due diligence with respect to Young. [Appellant] would have this [c]ourt believe that Young's letter exonerating [Appellant] serendipitously arrived the week after Fiddeman decided to prepare an affidavit. However, [Appellant] admitted that he knew Young, who grew up in the neighborhood and whose grandmother lived near the bar, [and who testified that he] had been trying to contact [Appellant] for years. Young testified that he had been attempting to contact [Appellant] since 2010[,] and had even provided his phone number to a mutual friend. [Appellant] failed to show that he exercised any due diligence when he failed reach out to Young to learn why he wanted to speak to him.

PCO at 13-14.

Again, the PCRA court's due diligence analysis turns on its assessment of the witnesses' credibility. Moreover, even though Appellant knew of Young's attempts to contact him, that does not mean Appellant also knew, or even should have suspected, that those attempted communications would be related to his conviction. Young stated on cross-examination that he gave out his phone number to "certain people" as early as 2010, "hoping that I would get a phone call. It was during that time. That's the only thing I ever

did." N.T., 7/2/18, at 60. He did not identify to whom he gave his number, nor what information he passed along at that time. Appellant testified that he was aware that Young was attempting to reach out to him, but that he did not know why until he received the letter. N.T., 7/5/18, at 111-12. Nothing of record indicates why Appellant would know that Young was a potential exonerating witness before he received the letter. Nevertheless, because the witnesses' credibility must be analyzed to establish whether Appellant acted diligently, and because the PCRA court did not hear that testimony in the first instance, we reject the PCRA court's conclusion that Appellant failed to act diligently with respect to the new facts presented by Young.

Finally, the PCRA court determined that neither Fiddeman's nor Young's testimony ultimately satisfy the prejudice prong of the after-discovered evidence test. The court stated that Appellant

> fails to satisfy the prejudice prong as he did not successfully plead and prove that the outcome of the trial would have been different with this "new" evidence. Both Young and Fiddeman's accounts from the night of the shooting are highly suspect, particularly since Fiddeman is a fellow inmate at SCI-Huntingdon.

PCO at 15.

This incredibly short analysis also relied solely on a rejection of the credibility of Young and Fiddeman. Thus, as above, we conclude that the PCRA court was not able to judge the credibility of these witnesses when their testimony was heard by a different judge. For the same reason, we cannot accept the court's conclusion that a jury would not have been swayed by their testimony.

- 32 -

Accordingly, given the defects in the PCRA court's rejection of Appellant's petition as detailed herein, we vacate the order denying Appellant's PCRA petition, and remand for further proceedings. Upon remand, we instruct the PCRA court to issue an order granting Appellant 60 days to seek leave to amend his petition to correct, if possible, the defects identified by the court in his petition for which he was given no prior notice. Any issues of material fact or credibility, whether relevant to a timeliness exception or the merits of the underlying claims, should then be resolved at a new hearing.

Order **vacated**. Case **remanded**. Jurisdiction **relinquished**.

Judge Nichols joins this memorandum.

Judge Kunselman concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/3/21